**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK (BROOKLYN DIVISION)**

-------------------------------------------------------- x

KIRYAT BELZ JERUSALEM,

            Plaintiff,

   -against-

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY,

            Defendants.

-------------------------------------------------------- x

> DOCKET NO. 20-cv-05810-HG-TAM
>
> **Defendant's Statement of Undisputed Material Facts**

Pursuant to Local Rule 56.1, Defendant Massachusetts Mutual Life Insurance Company ("MassMutual"), by and through the undersigned counsel, hereby submits the following statement of undisputed material facts:

### Kiryat Belz Jerusalem

1.    Kiryat Belz Jerusalem is a charitable organization that was set up by the Belz Worldwide Organization. Exhibit 1[1], November 23, 2021 Deposition of Yosef Gold ("Gold Dep.") at 13:2-10. The goal of the organization was to reestablish schools and different community services for the Belz community in the United States, Israel, and other parts of the world. Gold Dep. 13:10-14.

2.    The Belz community is a Hasidic Jewish community, comprised of thousands of people. Gold Dep. 13:21-14:2. Each city with a Belz community has its own congregation. Gold Dep. 14:3-14.

---

[1] MassMutual recognizes that Judge Gonzalez's Individual Practice Rules limit the total number of exhibits a party may file in support of any motion to 15 exhibits, and limit the number of pages for each exhibit to 15 pages. However, MassMutual filed its Rule 56.1 Statement of Undisputed Material Facts on April 4, 2022, before the case was reassigned from Judge Gujarati to Judge Gonzalez. MassMutual filed its Statement in accordance with Judge Gujarati's order and Individual Rules, which applied at the time the Statement was filed and did not impose similar limitations on exhibits. MassMutual respectfully requests that the Court consider all of its exhibits, despite the fact that they do not strictly comply with Judge Gonzalez's Individual Rules.

3.      In order to provide schools and various community services, Kiryat Belz Jerusalem received charitable funding from members of the Belz community. Gold Dep. 17:14-19:25. Because it was impossible to raise the amount of money it needed to establish everything the organization set out to accomplish, Kiryat Belz Jerusalem incurred a large amount of debt. Gold Dep. 15:11-21.

4.      In order to pay back various debts that the organization incurred from members of the community, Kiryat Belz solicited donations of the beneficial interests in life policies that were owned by members of the community. Gold Dep. 17:14-19:25. The way this worked was that the insured would change the ownership and beneficiary of the policy to Kiryat Belz, effectively donating the policy, Kiryat Belz would pay the premium, and when the insured passed away, some or all of the death benefit would be distributed to Kiryat Belz. Gold Dep. 18:23-20:14. Kiryat Belz would then use those funds to repay Kiryat Belz's original lenders or their children. Gold Dep. 20:6-14.

5.       Over the last ten years, Kiryat Belz has also been a beneficiary of 13 different life insurance policies, including the two policies at issue in this case. Exhibit 2, Plaintiff's Responses to Defendant's Interrogatory No. 3.

6.      Kiryat Belz officer Yoself Gold was responsible for making sure that there were sufficient funds to pay the premiums as they came due. Gold Dep. 24:8-12.

### The Policies

7.      On July 2, 2007, MassMutual issued a Flexible Premium Adjustable Life Insurance Policy, policy number 15624884 ("Policy No. 84"), which insured the life of Magdalena Knopfler and named Kiryat Belz as a part beneficiary. Policy No. 84 provided a death benefit of $600,000. *See* Exhibit 3.  Policy No. 84 required a planned periodic premium of

$5,700, payable quarterly. *See* Exhibit 9, Exhibit 15, (Policy Annual Reports for Policy No. 84).

8.     On September 4, 2007, MassMutual issued a Flexible Premium Adjustable Life Insurance Policy, policy number 15629027 ("Policy No. 27"), which also insured the life of Magdalena Knopfler and named Kiryat Belz as a part beneficiary. Policy No. 27 provided a benefit of $350,000. *See* Exhibit 4. Policy No. 27 required a planned periodic premium of $3,400, payable quarterly.  See Exhibit 12, Exhibit 14 (Policy Annual Report for Policy No. 27).

9.     Magdalena Knopfler and her husband were members of the Kiryat Belz community and charitably made Kiryat Belz a beneficiary on each policy. Gold Dep. 19:8-25. In the application for both policies, "children of the insured" were listed as the intended beneficiaries. Exhibit 3 at MM/KIRYAT BELZ_001278, Exhibit 4 at MM/KIRYAT BELZ_001889.

10.     In January 2008, MassMutual received a Beneficiary Change Request for Policy No. 84 and Policy No. 27 (the "Policies"), changing the beneficiary designation as follows: 90% to Kiryat Belz and 10% to Ms. Knopfler's daughter. Exhibit 3 at MM/KIRYAT BELZ_001295, Exhibit 4 at MM/KIRYAT BELZ_001910.

11.     In January 2008, a Change of Ownership form was also submitted for the Policies and Kiryat Belz took over ownership and control of them because Ms. Knopfler's husband could no longer pay the premiums. Gold Dep. 37:6-14; Exhibit 3 at MM/KIRYAT BELZ_001290-94, Exhibit 4 at MM/KIRYAT BELZ_001905-09. After it took ownership of the Policies, Kiryat Belz was at all times responsible for paying the premium for the Policies. Gold Dep. 49:25-50:4.

12.     Both Policies featured flexible premium structures that allowed Kiryat Belz to pay premium when it chose so long as the Policies maintained sufficient value. Specifically, the Policies provided that "Monthly Charges are due and deducted from the value of th[e] Polic[ies]

each month. After the first premium has been paid, there is no requirement that any specific amount of premium be paid on any date. Instead, within the limits stated in the policy, any amount may be paid on any date during the lifetime of the Insured." Exhibit 3 at MM/KIRYAT BELZ_001241, Exhibit 4 at MM/KIRYAT BELZ_001850. As per the terms of the Policies, MassMutual notified Kiryat Belz whenever the Policies' value risked becoming too low, thus putting the Policies at risk of lapsing.  Exhibit 3 at MM/KIRYAT BELZ_001252, Exhibit 4 at MM/KIRYAT BELZ_001861; Gold Dep. 61:3-62:10.

13.     Both Policies provided that MassMutual would "credit each net premium to the account value of th[e] policy on the date [MassMutual] receive[s] the premium payment." Exhibit 3 at MM/KIRYAT BELZ_001249, Exhibit 4 at MM/KIRYAT BELZ_001858.

### Pattern of Delayed Payments

14.     Mendy Monhiet, a volunteer for Kiryat Belz, typically handled premium payments for the Policies. Exhibit 5, November 23, 2021 Deposition of Mendy Monhiet ("Monhiet Dep.") at 14:5-11. Every quarter when premium payments became due, Mr. Monhiet would "ask Mr. Gold if there [wa]s money" to pay the premium, and, if he said yes, would send out the check." Monhiet Dep. 14:21-15:5.

15.     Kiryat Belz does not have any past or present written policies or procedures with respect to paying premium for the life insurance policies it owns. Monhiet Dep. 22:4-7; Gold Dep. 27:20-28:8.

16.     An account from Northfield Bank labeled Cong Kolel Ohel Yesochor (the "Northfield Bank Account") was the account that was typically used by Kiryat Belz to pay premium for life insurance policies. Monhiet Dep. 18:6-19-3; Gold Dep. 77:6-79:5.

17.     There were multiple instances over the years in which Kiryat Belz sent a premium

payment for the Policies via a check that was dated well before the date the check was received by MassMutual. *See* ¶¶ 18-22.

18.     On November 21, 2016, MassMutual received a premium payment in the form of a check for $5,700 from the Northfield Bank Account that was intended for Policy No. 84. Exhibit 6. The check was dated October 1, 2016. The annual policy report for Policy No. 84 confirms that although the premium check was dated October 1, 2016, it was received by MassMutual approximately 51 days later, on November 21, 2016. Exhibit 9.

19.     On March 14, 2017, MassMutual received a check for $5,700 from the Northfield Bank Account as premium payment for Policy No. 84. Exhibit 7. The check was dated December 28, 2016. The annual policy report for Policy No. 84 confirms that although the premium check was dated December 28, 2016, it was listed as received by MassMutual approximately 77 days later on March 15, 2017. Exhibit 9.

20.     On August 30, 2017, MassMutual received a check for $5,700 from the Northfield Bank Account as premium payment for Policy No. 84. Exhibit 8. The check was dated June 25, 2017. The annual policy statements confirm that although the premium check was dated June 25, 2017, it was received by MassMutual approximately 66 days later, on August 30, 2017. Exhibit 9, Exhibit 10.

21.     On August 24, 2016, MassMutual received a check for $4,551.68 from the Northfield Bank Account as premium payment for Policy No. 27. Exhibit 11. The check was dated June 1, 2016. The annual policy statement confirms that although the premium check was dated June 1, 2016, it was received by MassMutual approximately 84 days later, on August 24, 2016. Exhibit 12.

22.     On August 4, 2017, MassMutual received a check for $3,400 from the Northfield

Bank Account as premium payment for Policy No. 27. Exhibit 13. The check was dated June 1, 2017. The annual policy statement confirms that although the premium check was dated June 1, 2017, it was received by MassMutual approximately 64 days later, on August 4, 2017. Exhibit 14.

23.     Mr. Monhiet claimed that usually when he prepares a check, he mails it out right away. Monhiet Dep. 37:20-24. However, Kiryat Belz also did not have a system in place to track when checks were mailed. Gold Dep. 70:24-71:14.

24.     When questioned about the cause of the significant delays between when certain premium checks were dated and when they were received by MassMutual, Mr. Gold asserted that he "ha[d] no answer" and no explanation. Gold Dep. 65:2-66:6, 68:2-69:2.  Kiryat Belz's bank records reveal, however, that Kiryat Belz's account was frequently overdrawn and routinely did not have sufficient funds to satisfy the premium requirements for the Policies. *See* Exhibits 24-28 (the Northfield Bank Account statements). Kiryat Belz occasionally received significant deposits, which then allowed Kiryat Belz to have the funds to maintain the Policies – however, Kiryat Belz appears to have waiting for those deposits prior to submitting the previously-dated premium checks for the Policies in order to ensure that Kiryat Belz had sufficient funds to make the requirement premium payments. *See* Exhibits 24-28.

## Lapse of Policy No. 84

25.     Although Policy No. 84 had a flexible premium structure, the planned quarterly premium for Policy No. 84 was $5,700. Exhibit 15.  In July 2019, MassMutual sent an annual policy statement, which provided that if no further premiums were paid after July 2, 2019, the policy would terminate without value on that date. Exhibit 15 at MM/KIRYAT BELZ_000510.

26.     Policy No. 84 provides that "[m]onthly charges are deducted from the value of

this policy each month. If the value cannot cover the monthly charges for a month, the policy may terminate 61 days after the due date" Exhibit 3 at MM/KIRYAT BELZ_001241. The Grace Period and Termination provision for the Policies is as follows:

| Grace Period And Termination | This policy may terminate without value if, on any Monthly Charge Date, the account value is not sufficient to cover the monthly charges due and the safety test is not met. The safety test is discussed in the next provision. |
|---|---|
| | However, we allow a grace period for payment of the amount of premium (not less than $20) needed to avoid termination. The grace period begins on the date the monthly charges are due. It ends 61 days after that date or, if later, 31 days after we mail a written notice to the Owner and to any assignee shown in our records at their last known addresses. This notice will state the amount of premium needed to avoid termination. |
| | During the grace period, the policy will stay in force. If the Insured dies during the grace period, any unpaid premium amount needed to avoid termination will be deducted from the death benefit (see the **Amount Of Death Benefit** provision in Part 5). The policy will terminate without value if we do not receive payment of the required amount by the end of the grace period. |
| | While there is a loan outstanding on this policy, our right to terminate this policy under the terms of the **Policy Debt Limit** provision (see Part 4) applies in addition to our right under this provision. |

Exhibit 3 at MM/KIRYAT BELZ_001252.

27.     New York Insurance Law § 3211(a)(1) requires that an insurance company mail a notice prior to termination of a life insurance policy for nonpayment of premium no earlier than and within thirty days after the day when the insurer determines that the net cash surrender value under the policy is insufficient to pay the total charges that are necessary to keep the policy in force. New York Insurance Law §3203(a)(1) also entitles the policyholder of a variable policy to a sixty-one day grace period.

28.     When no additional premium payment was received by July 2, 2019, MassMutual sent an initial grace notice to Kiryat Belz dated July 3, 2019 advising that Kiryat Belz had until September 6, 2019 to provide a premium payment or the coverage would terminate. The July 3, 2019 notice specifically stated that the policy "is in its grace period as a result of not having met

the required premium or account value to keep the policy in force." The premium amount due was $6,836.46. *See* Exhibit 16.

29.     The July 3, 2019 notice was mailed to Kiryat Belz at 1301 47th Street, Brooklyn, NY 11219, which was the proper mailing address and office address of Kiryat Belz at the time. Gold Dep. 28:25-29:5.

30.     Thirty-six (36) days later, MassMutual sent another grace notice dated August 8, 2019, indicating that it had not received the premium payment necessary to keep the policy in force and warned that the policy was still in danger of terminating on September 6, 2019. The notice specifically stated that MassMutual had "previously notified [Kiryat Belz] that [the] policy [wa]s in its grace period." Exhibit 17.

31.     The August 8, 2019 notice was mailed to the proper mailing address of Kiryat Belz at 1301 47th Street, Brooklyn, NY 11219. Gold Dep. 28:25-29:5.

32.     MassMutual did not receive the premium payment necessary to keep the policy in force by September 6, 2019, and the policy lapsed on that date as a result. Exhibit 18.

33.     Sixty-five (65) days after the first grace notice was sent, MassMutual sent a termination letter dated September 6, 2019 to Kiryat Belz explaining that coverage had expired because there was insufficient value to cover the monthly charges. Exhibit 18.

34.     The termination notice was mailed to the proper mailing address of Kiryat Belz at 1301 47th Street, Brooklyn, NY 11219. Gold Dep. 28:25-29:5.

35.     The grace notice for Policy No. 84 complied with New York Insurance Law § 3211(a)(1), as it was sent 1 day after MassMutual determined that the net cash surrender value for Policy No. 84 was insufficient to pay the total charges that are necessary to keep the policy in force, which was no earlier than and within thirty days after MassMutual made that

determination.  *See* Exhibit 16.  MassMutual also provided Kiryat Belz with more than the required 61 day grace period, specifically MassMutual provided a grace period from July 2, 2019 to September 6, 2019, which met the requirements of New York Insurance Law § 3203(a)(1).

36.     The grace notice for Policy No. 84 also complied with the terms of Policy No. 84. Policy No. 84 indicates that MassMutual will allow a grace period beginning on the date the monthly charges are due and ending 61 days after that date or, if later, 31 days after MassMutual mails a written notice to the Owner and to any assignee shown in its records. Exhibit 3 at MM/KIRYAT BELZ_001252.  Here, MassMutual sent the initial grace notice on June 3, 2019, prior to the lapse date of September 6, 2019, indisputably complying with the terms of Policy No. 84. Exhibit 3 at MM/KIRYAT BELZ_001252; Exhibit 16.

37.     The date the checks were written and sent is irrelevant, as New York law provides that an insurance policy's unambiguous provisions must be given their plain and ordinary meaning and should be construed so as to give full meaning and effect to all of the provisions, including any provision requiring premium to be received (not sent) prior to the date the policy would terminate for non-payment of premium. *Zamora-Leon v. United of Omaha*, 2017 WL 4155403, *3 (S.D.N.Y. Sept. 18, 2017); *See also Halberstam v. Allianz Life Ins. Co. of N. Am.*, 2017 WL 10187689, at *6 (E.D.N.Y. June 9, 2017) (rejecting plaintiff's argument that grace notice requiring receipt of premium payment by the due date was improper and finding that the notice was plainly in accordance with the terms of the policy).

38.     Both Policy No. 84 and Policy No. 27 provide that MassMutual "credit[s] each net premium to the account value of the policy on the date [it] receive[s]d the premium payment." Exhibit 3 at MM/KIRYAT BELZ_001249, Exhibit 4 at MM/KIRYAT BELZ_001858.

**Lapse of Policy No. 27**

39.     Although Policy No. 27 had a flexible premium structure, the planned quarterly premium for Policy No. 27 was $3,400. *See* Exhibit 12.

40.     Policy No. 27 provides that "[m]onthly charges are deducted from the value of this policy each month. If the value cannot cover the monthly charges for a month, the policy may terminate 61 days after the due date" Exhibit 4 at MM/KIRYAT BELZ_001850. The Grace Period and Termination provision for the Policies is as follows:

Grace Period
And Termination

This policy may terminate without value if, on any Monthly Charge Date, the account value is not sufficient to cover the monthly charges due and the safety test is not met. The safety test is discussed in the next provision.

However, we allow a grace period for payment of the amount of premium (not less than $20) needed to avoid termination. The grace period begins on the date the monthly charges are due. It ends 61 days after that date or, if later, 31 days after we mail a written notice to the Owner and to any assignee shown in our records at their last known addresses. This notice will state the amount of premium needed to avoid termination.

During the grace period, the policy will stay in force. If the Insured dies during the grace period, any unpaid premium amount needed to avoid termination will be deducted from the death benefit (see the **Amount Of Death Benefit** provision in Part 5). The policy will terminate without value if we do not receive payment of the required amount by the end of the grace period.

While there is a loan outstanding on this policy, our right to terminate this policy under the terms of the **Policy Debt Limit** provision (see Part 4) applies in addition to our right under this provision.

Exhibit 4 at MM/KIRYAT BELZ_001861.

41.     New York Insurance Law § 3211(a)(1) requires that an insurance company mail a notice prior to termination of a life insurance policy for nonpayment of premium no earlier than and within thirty days after the day when the insurer determines that the net cash surrender value under the policy is insufficient to pay the total charges that are necessary to keep the policy in force. New York Insurance Law §3203(a)(1) also entitles the policyholder of a variable policy to a sixty-one day grace period.

42.     A planned quarterly payment for Policy No. 27 was due on or about June 1, 2019, but it was not received. Exhibit 29, February 3, 2022 Deposition of Denise Harriman ("Harriman Dep.") at 21:23-23:5.

43.     MassMutual sent a grace notice to Kiryat Belz dated June 5, 2019 advising that Kiryat Belz had until August 6, 2019 to provide a premium payment or the coverage would terminate. *See* Exhibit 19. The June 5, 2019 notice specifically stated that the policy "is in its grace period as a result of not having met the required premium or account value to keep the policy in force." The premium amount needed to keep the policy in force was $4,099.85. Exhibit 19.

44.     The June 5, 2019 notice was mailed to the proper mailing address of Kiryat Belz at 1301 47th Street, Brooklyn, NY 11219. Gold Dep. 28:25-29:5.

45.     Thirty-three (33) days later, MassMutual sent another grace notice dated July 8, 2019 indicating that it had not received the premium payment necessary to keep the policy in force and warned that the policy was in danger of terminating on August 6, 2019. Exhibit 20. The notice specifically stated that MassMutual had "previously notified [Kiryat Belz] that [the] policy [wa]s in its grace period." Exhibit 20.

46.     The July 8, 2019 notice was mailed to the proper mailing address of Kiryat Belz at 1301 47th Street, Brooklyn, NY 11219. Gold Dep. 28:25-29:5.

47.     MassMutual did not receive the premium payment necessary to keep the policy in force by August 6, 2019, and the policy lapsed on that date as a result. Exhibit 21.

48.      Sixty-two (62) days after the first grace notice was sent, MassMutual sent a termination letter dated August 6, 2019 to Kiryat Belz explaining that coverage had expired because there was insufficient value to cover the monthly charges. *See* Exhibit 21.

49.    The termination notice was mailed to the proper mailing address of Kiryat Belz at 1301 47th Street, Brooklyn, NY 11219. Gold Dep. 28:25-29:5.

50.    The grace notice for Policy No. 27 complied with New York Insurance Law § 3211(a)(1), as it was sent 1 day after MassMutual determined that the net cash surrender value for Policy No. 27  was insufficient to pay the total charges that are necessary to keep the policy in force, which was no earlier than and within thirty days after MassMutual made that determination.  *See* Exhibit 19.  MassMutual also provided Kiryat Belz with a 61 day grace period, specifically from June 4, 2019 to August 6, 2019, which met the requirements of New York Insurance Law § 3211(a)(1).

51.    The grace notice for Policy No. 27 also complied with the terms of Policy No. 84. Policy No. 27 indicates that MassMutual will allow a grace period beginning on the date the monthly charges are due and ending 61 days after that date or, if later, 31 days after MassMutual mails a written notice to the Owner and to any assignee shown in its records. Exhibit 4 at MM/KIRYAT BELZ_001861. Here, MassMutual sent the initial grace notice on June 5, 2019, prior to the lapse date of August 6, 2019, indisputably complying with the terms of Policy No. 27.

52.    Additionally, the date the checks were written and sent is irrelevant, as New York law provides that an insurance policy's unambiguous provisions must be given their plain and ordinary meaning and should be construed so as to give full meaning and effect to all of the provisions, including any provision requiring premium to be received (not sent) prior to the date the policy would terminate for non-payment of premium. *Zamora-Leon v. United of Omaha*, 2017 WL 4155403, *3 (S.D.N.Y. Sept. 18, 2017); *See also Halberstam v. Allianz Life Ins. Co. of N. Am.*, 2017 WL 10187689, at *6 (E.D.N.Y. June 9, 2017) (rejecting plaintiff's argument that

grace notice requiring receipt of premium payment by the due date was improper and finding that the notice was plainly in accordance with the terms of the policy).

53.     Both Policy No. 84 and Policy No. 27 provide that MassMutual "credit[s] each net premium to the account value of the policy on the date [it] receive[s]d the premium payment." Exhibit 3 at MM/KIRYAT BELZ_001249, Exhibit 4 at MM/KIRYAT BELZ_001858.

### Post-Lapse Events

54.     On November 14, 2019, months after Policy No. 27 terminated for non-payment of premium on August 6, 2019, MassMutual received a check in the mail for $4,099.85 from Kiryat Belz (Check No. 8863) intended for Policy No. 27. Exhibit 22; Harriman Dep. 24:17-25:9. The check was dated July 15, 2019, approximately four months prior to the date it was received by MassMutual. *See* Exhibit 22; Harriman Dep. 24:17-25:9.

55.     On November 13, 2019, months after Policy No. 84 terminated for non-payment of premium on September 6, 2019, MassMutual also received a check in the mail for $6,836.45 from Kiryat Belz (Check No. 8862) intended for Policy No. 84. Exhibit 23. The check was dated July 15, 2019, approximately four months prior to the date it was received by MassMutual. Exhibit 23; Harriman Dep. 33:17-34:12.

56.     In July 2019, the month that Check No. 8862 and Check No. 8863 (the "Checks") were dated, the Northfield Bank Account had a minimum balance of negative $44,746.18 and an average balance of $328.40. Exhibit 24. Several other checks from the account were returned for insufficient funds during that month as well. *See* Exhibit 24.

57.     In August 2019, the Northfield Bank Account had a minimum balance of negative $29,412.38 and an average available balance of $43.41. Exhibit 25. Several other checks from

the account were returned for insufficient funds during that month. *See* Exhibit 25.

58.     In September 2019, the Northfield Bank account had a minimum balance of negative $26,721.97 and an average available balance of $1,906.09. Exhibit 26. Several other checks from the account were returned for insufficient funds during that month. *See* Exhibit 26.

59.     In October 2019, the Northfield Bank account had a minimum balance of negative $38,989.28 and an average available balance of $1,702.99. Exhibit 27. Several other checks from the account were returned for insufficient funds during that month. *See* Exhibit 27.

60.     In November 2019, the Northfield Bank account statement shows that Check No. 8862 and Check No. 8863 were credited to the account on November 14th and November 15th. Exhibit 28. The checks cleared approximately four months after they were written.

61.     Kiryat Belz had no explanation for the delay between when the Checks were dated and when the Checks were received by MassMutual. Gold Dep. 86:22-87:23, 98:15-99:14. Mr. Monhiet claimed that all checks were generally mailed shortly after they were written ("within a week") and Kiryat Belz claimed that all premiums were paid as soon as a bill was received. Monhiet Dep. 23:21-24:4; Exhibit 2, Plaintiff's Responses to Defendant's Interrogatory Nos. 6-7. Kiryat Belz also specifically claims that Check No. 8862 and Check No. 8863 were sent to MassMutual the same day that they were written. Exhibit 2, Plaintiff's Response to Defendant's Interrogatory Nos. 8, 10.

62.     The date the checks were written and sent is irrelevant, as New York law provides that an insurance policy's unambiguous provisions must be given their plain and ordinary meaning and should be construed so as to give full meaning and effect to all of the provisions, including any provision requiring premium to be received (not sent) prior to the date the policy would terminate for non-payment of premium. *Zamora-Leon v. United of Omaha*, 2017 WL

4155403, *3 (S.D.N.Y. Sept. 18, 2017); *See also Halberstam v. Allianz Life Ins. Co. of N. Am.*, 2017 WL 10187689, at *6 (E.D.N.Y. June 9, 2017) (rejecting plaintiff's argument that grace notice requiring receipt of premium payment by the due date was improper and finding that the notice was plainly in accordance with the terms of the policy).

63.    Both Policy No. 84 and Policy No. 27 provide that MassMutual "credit[s] each net premium to the account value of the policy on the date [it] receive[s]d the premium payment." Exhibit 3 at MM/KIRYAT BELZ_001249, Exhibit 4 at MM/KIRYAT BELZ_001858.

64.    MassMutual did not receive the required premium check for Policy No. 27 until November 14, 2019 (months after Policy No. 27 lapsed on August 6, 2019) and it did not receive the required premium check for Policy No. 84 until November 13, 2019 (months after Policy No. 84 lapsed on September 6, 2019).  *See* Exhibits 22-23.

65.    On November 13th and 14th, when MassMutual received the two respective checks, MassMutual's system attempted to apply the payments, but a rejection notice was automatically generated by the system after the payment was rejected. Harriman Dep. 26:2-27:18, Exhibit 30, Exhibit 31. The payments were rejected because the Policies had already lapsed. Harriman Dep. 35:22-37:9.

66.    MassMutual immediately returned the respective checks for $6,836.45 and $4,099.85 to Kiryat Belz. Exhibit 2, Plaintiff's Responses to Defendant's Interrogatory No. 13.

67.    On December 19, 2019, Kiryat Belz officer Yosef Gold called MassMutual to inquire about the process for reinstating the Policies. Exhibit 32. MassMutual emailed Mr. Gold, explaining the reinstatement process and attaching the necessary documents. Mr. Gold never submitted a reinstatement application. Exhibit 33.

68.     On April 6, 2020, Magdalena Knopfler passed away. Exhibit 34.

69.     Kiryat Belz submitted a claim for death benefits under the Policies on June 11, 2020. Exhibit 35. MassMutual did not pay the death benefit for either policy because both Policies had lapsed prior to the death of Magdalena Knopfler.


Dated: June 21, 2022                         FAEGRE DRINKER BIDDLE & REATH LLP


                                             By:  /s/ *Nolan Tully*
                                             _____
                                                 Nolan Tully
                                                 Nolan.Tully@faegredrinker.com
                                                 One Logan Square, Suite 2000
                                                 Philadelphia, PA  19103
                                                 Telephone:  +1 215 988 2700
                                                 Facsimile:  +1 215 988 2757

                                             *Attorney for Defendant Massachusetts Mutual Life Insurance Company*

## **<u>CERTIFICATE OF SERVICE</u>**

This is to certify that a true and correct copy of the foregoing document has been served

on all counsel of record via e-mail on June 21, 2022.


Dated: June 21, 2022                    <u>/s/ *Nolan Tully*            </u>
                                                      Nolan Tully